May it please the court I am Rebecca curves arguing this morning on behalf of Mr. Anthony Collins. The issue in this case is whether law enforcement officers had reasonable suspicion to stop Mr. Collins after seeing him leave a house at which there had been drug activity in the past. The magistrate judge relied on six factors to conclude that reasonable suspicion existed in this case. First, he was seen leaving the house where drug activity had occurred in the past. It was roughly at 3.30 a.m. or somewhat after that. He was only at the house for 10 or 15 minutes. He failed to immediately come to a stop when the officers activated their lights and sirens to pull him over. After the car came to a stop, he was moving around inside the vehicle. They thought he might be hiding an object or something like that. And he did not keep his hands outside of the driver's side window as he had been ordered to do so by the officers. A Terry stop, though, has to be justified at its inception. The last three factors that I read to you were things that occurred after the stop was initiated. Those can't be used to bolster the other, the first three factors regarding the location where this drug activity was suspected to have occurred. So the reasonable suspicion for this stop is going to rise or fall based on the fact that he was at a home known for drug activity. It was early in the morning and he was only there very briefly. One of the reasons that I think that we give such strong weight when we say, oh, the defendant was seen at a known drug house or, oh, the defendant was in a high crime area, is that in those locations it has been established that the criminal activity is so prevalent that it makes it more likely that people in that area or in that house might be engaged in that criminal activity. Here at this particular residence, this is not a real hotbed of drug dealing. There were two undercover transactions at this residence. One of them was in August of 2014. That is two years prior to the stop of my client. The second undercover transaction involved a sale of methamphetamine. That was in April of 2016. That is two months prior to the car stop in this case. Although the police had apparently been kind of keeping tabs on this residence for this two-year time period, they never obtained a search warrant to search the house. Officer Murphy did testify that she had conducted surveillance, that she had seen vehicular and foot traffic at the house. However, she did not see any drug transactions and did not stop any individuals as they were leaving that house. But weren't there some, there was CI information that they had been buying there for some period of time? Yes, there was a CI who told Detective Cartwright two things. I've been buying methamphetamine from Mr. Curry, the homeowner, and I believe that Mr. Curry is converting airsoft guns, these toys, into operable firearms. The second part of that regarding the firearms, that was never corroborated by any information. Now, Officer Murphy also testified that other officers had made stops in that area. She didn't specifically say coming from the house, but she said in that area. But she never testified whether those stops resulted in any arrests of people who had actually, were in possession of drugs that they got from that house. So in this case, I don't think you can say that drug activity at the house is not so, is so prevalent that it makes it, you know, much stronger, the notion that maybe Mr. Collins was engaged in criminal activity. If you compare this case with two other Eighth Circuit cases, Robinson and Spots, and I discussed these in the brief pretty thoroughly. In the Robinson instance, you had four search warrants served at the location. You had controlled purchases. Hand-to-hand drug transactions were seen at the location. Same with Spots. Frequent traffic, short visits, they saw hand-to-hand drug transactions. But what they had in Robinson and in Spots was also a link to the defendant. They had particularized suspicion as to that defendant because informants had told them Mr. Robinson is a drug dealer, Mr. Spots is a drug dealer. Here, the only nexus we have is to this location. And as I've already discussed, temporally, the transactions here are two years old and two months old. Also cited in my brief is United States v. Black and then a Seventh Circuit case, United States v. Bowman out of the Seventh Circuit. Both of those cases... What about the fact that the time of the visit to the home, the duration of the visit to the home, and the location of the visit to the home? Do those add any suspicion to the evidence about the location of the hand-to-hand drug? Sure. Those first three factors about the location, brevity of the stop, time of day, those do add to it. They do. Now, I don't think that... It's more than just a location where drugs have been sold two months ago. Did the C.I. say anything about... That he'd purchased before. But more recent than two months? Well, no. That information was provided before the undercover buy-in. So you say there's nothing between the buy two months earlier? Right. My recollection is the informant had said, I've gotten methamphetamine here before. So then they set up the April 2016. And so the only thing that we know in between that two-month time period is that Officer Murphy and Officer Swaggart have been sitting on the house and doing some surveillance. But they didn't give a lot of detail with respect to that. Officer Swaggart testified that she may have been there three times in that two-month time period, but it could have been less. What about these other facts, the late night hour, brevity? They definitely do contribute. That is fair. I just don't think that they have such strong weight that you can say, anybody coming out of that drug house, we have reasonable suspicion to stop. Well, that's why I have those facts, because it wouldn't be anybody coming out of somebody's house. Well, okay. We may have gone there and stayed for an hour and a half, but it might look more like they went for lunch. Somebody comes in at 3.30 in the morning and goes in the garage for five minutes. It might look more like a drug. That's why I'm asking. And that's where I was going with, I think, Bowman and with United States v. Black. They placed heavy reliance on the fact that there was not particularized suspicion beyond seeing a defendant at a particular location. In the United States v. Black, it was an auto body shop. People coming and going all of the time. More than one undercover informant had told police that drug dealing was going on there. But that was not enough, even though Mr. Black had been seen coming and going from there quite frequently, and everybody knew what was going on at that location. They didn't have particularized suspicion as to him. That makes the case substantially weaker, in my opinion. Would you like to take any time for rebuttal? I will. Thank you very much. Good morning. May it please the Court, my name is Allison Denning. I'll be arguing on behalf of the government. And as counsel stated, there is a single question in this case, which is, did Officers Murphy and Swaggart have reasonable suspicion to conduct this car stop on the defendant in his car on June 13, 2016? And the government clearly believes that that answer is yes. And I would at the outset say that the government does recognize that the factors that we are focusing on for this purpose is being at the house known for drug activity, the time of night, and the brief visit to justify that stop at its inception. If we agree that the beginning of that contact with Mr. Collins was at the time that the officers lit up his car with their lights and sirens, then working back from that, the government understands that those factors are key in the analysis. Just to be clear on that premise, there wasn't a seizure, was there, at the time they turned on the lights, if the person didn't stop? As if to indicate to the defendant to stop when he was in a parking lot, the defendant backed his vehicle up away from the officer, and that was counted as part of the inquiry about reasonable suspicion in that case. And so in answer to that question, I think potentially the immediate reaction to them initiating the stop might be relevant. But the government's position is it's not necessary, because certainly at the time that they initiated the car stop, they had reasonable suspicion to do so. And to Your Honor's point about what was happening from April 2016 to this car stop on June 13, 2016, there actually was more information and more that had been done other than just the surveillance. Detective Cartwright, he testified that because his appearance changes so drastically, that he was actually able to go in as an undercover both in August 2014 and April 2016, but apparently under a somewhat different persona because he looked so much different that Mr. Curry didn't realize it was him. There were two different confidential informants on each of those deals. But after the April 2016 undercover buy that was completed with Mr. Curry in the garage of his residence there at 9028 Oak Street, Detective Cartwright also testified that there was an attempted buy with a separate undercover officer, not him, and a third confidential informant, and that those two individuals, the undercover officer and the informant, went to Curry's address about three weeks after Cartwright's April 2016 buy. And that second undercover officer and third informant got to the driveway of Mr. Curry's residence. Mr. Curry came out to interact with them apparently, and he describes it as he was told because it wasn't him, but Curry saw a car driving by or in the area that he somehow perceived might be indication of police presence. And he, I don't know if he yelled or he commented, but he said the words police, police, and he ended up running into his garage of his residence and shutting the door, and then the deal didn't take place. And so certainly that spans that distance between April and June, the date of the car stop. Additionally, I think it's important to know that Officer Murphy, this is not a situation where Detective Cartwright had an interest in this house and contacts Officer Murphy to help him. It actually occurred the other way around in a sense in terms of who contacted who. Because Officer Murphy was a district officer. She worked in a, you know, she's a uniformed police officer in a marked patrol vehicle, and she had heard in her testimony in the hearing that there was some activity, some arrests taking place in that neighborhood. And she testified it was a quiet neighborhood. There wasn't, you know, known for the area is not high crime area. This is just a neighborhood. And so she went and she looked up a report of an arrest, and it described in the report based on what she concluded from reading that is that this address, 9028 Oak Street, was a suspicious, was suspected to be a meth house. She put that together with information she knew about a person who lived in that neighborhood who had died from a drug overdose. And in her mind she thought perhaps this person got their drugs from this same house because the person who died didn't drive much, and she figured he probably had to get his drugs from somewhere near his house. And he apparently lived near Mr. Curry. And so she, it was that interest that she had in the house that she ended up checking that address to make sure nobody else had an interest in it, and that's how she got in touch with Detective Cartwright. And so it's important to know that she had her own suspicions about that, I believe, because, and she also had an understanding that drug deals would be the type of thing, high traffic area to and from a house would indicate potential drug activity. She knew that brief visits would indicate potential drug activity. So when she spoke with Detective Cartwright, he actually gave her more information about this particular house and confirmed that this is a house that's known for drug activity. There's just really no way around that characterization that it was. The undercover buy had been made there. It was of methamphetamine, and Mr. Collins was not just present in the area of the house, as is the case in some of the cases that were cited in the briefs. He's not even just present at the house. He's present at the particular location in that house, the south garage, which was where the undercover buys had both taken place, and it is where the confidential informants, three separate confidential informants, had told Detective Cartwright, as he put it, the exact same information about these sales. And so they had very good basis to believe that that house and that south garage was used for drug sales. They also knew that they happened overnight, and that wasn't just sort of a shot in the dark, so to speak, that bad things happen at night. There was actually information that Mr. Curry, who was the person selling drugs, did that at night because he had a day job. And at 5 o'clock he got off work, got his drugs, he went home, and in the garage he would wait for people to show up to get drugs. And the officers also knew he drove a white motorcycle, so if the white motorcycle is there, that's a good sign he's there. And so on June 13, 2016, when Murphy and Swaggart are there, they're seeing all these things come together. This is the house. This person drives up, and he doesn't just drive up, he goes into the garage, stays for 10 to 15 minutes, consistent with the typical drug sale. And he's doing it in the time when you would expect Mr. Curry to be selling drugs, and Mr. Curry was apparently home because his motorcycle was there and there was a light on in the garage. The other thing that sort of spans that distance, as opposing counsel spoke to, is that they had Detective Cartwright testified. I think he put it as they had kind of kept Mr. Curry on a loose radar for the period of time from August 2014 until June 2016. Officers Murphy and Swaggart had also done that surveillance, and they saw higher increased traffic. And Officer Murphy testified that that higher than expected traffic at a residence, especially in the overnight hours and for short periods of time, all indicated to her that there's a reason to believe that Mr. Curry is doing exactly what he's been doing. They may not have been in there and having direct contact with him, but there's no reason for them to believe he was doing anything differently in June 2016 than he had done in April 2016 at that attempted drug buy, three weeks in between those, or back in August of 2014. The government would just say these cases that have been cited, Robinson and Spots, by the appellant, those are both cases where there was a search warrant being served, but in neither of those cases did they see the defendants go into the house. One of them, he was stopped on the street. The other one, he had been seen kind of exiting his car, but he wasn't seen going in the house. And that's what makes this case so much clearer, is because Mr. Collins was not just in the area of Curry's house. He was in the south garage where drug sales took place of the house. And he was in there for exactly the amount of time you'd expect him to be for a drug buy and exactly the time when Mr. Curry was home. The black case was actually a case where the evidence was critiqued because there was reason to believe that a car had been in the area of a suspicious place, but nobody had ever seen the driver of the car, which is, of course, distinguishable greatly from this case where Mr. Collins was seen going into the place. And the Bowman case is kind of similar to that. The officer in that case had had a tip that there was a house that was cooking meth and that had identity of the meth cook in the meth cook's car, but had never confirmed any of that and never saw that person. And so, again, those cases are all quite distinguishable from the facts of the current case. And, really, what they knew about that house was quite extensive. The defendant was showing up there at exactly the time you'd expect and spending the amount of time you'd expect for there to be a drug deal taking place. And so, for those reasons, the government does believe the officers had reasonable suspicion to initiate that car stop. Thank you. Thank you. I have a question. Sure. Is your challenge limited just to the initial terrorism? Yes. I think if the stop is valid, I think they're able to get him out of the car and look inside the car. One thing I wanted to point out, and I think this just takes a little bit of reading between the lines, is that when they started following Mr. Collins and then until the point where they actually initiate the stop, I think it's roughly five minutes. Now, granted, one of the officers testified that they wanted to get a little bit away from the house, not announce their police presence, but I think that indicates that they doubted whether they had reasonable suspicion for this stop. They are waiting and waiting for him to commit a traffic violation, and he just doesn't do it. As far as there being three separate constitutional informants, we have no information at all regarding the reliability of those informants. One of them obviously was reliable because they did the purchase of methamphetamine after he provided information. The other two, not so sure. There is never anything corroborated about these refashioning of firearms. Council mentioned that the 10 or 15 minutes that Mr. Collins was in the home was exactly the amount of time you would expect for the drug deal, but not in this particular case. When they did the undercover buy for the methamphetamine, they waited in his residence for, I think, over an hour. He had to go get the drugs and bring them back. The first buy two years prior was for hash and was such a small amount, he just gave it to them. There is no typical MO for this particular house or for this particular dealer. Thank you. Thank you very much, Mr. Cardenas.